No. 23-3764

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

GLEN MORGAN,

*Plaintiff — Appellant,*

v.

TWITTER, INC.[1],

*Defendant — Appellee.*

Appeal from the United States District Court for the
Eastern District of Washington; No. 3:22-cv-00122-MKD

GLEN MORGAN'S OPENING BRIEF

ARD LAW GROUP PLLC

Joel Ard
joel@ard.law
P.O. Box 11633
Bainbridge Island, Washington 98110
(206) 701-9243

ALBRECHT LAW PLLC

David K. DeWolf
david@albrechtlawfirm.com
5105 E 3rd Ave., Suite 101
Spokane Valley, WA 99212
(509) 495-1246

April 19, 2024

---

[1] Since the case was filed, Twitter has been renamed "X." Morgan continues to refer to the entity as "Twitter," consistent with earlier pleadings and rulings.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES ................................................................ 1

STATEMENT OF THE CASE ........................................................... 2

    I. OVERVIEW ...................................................................... 2

    II. BACKGROUND FACTS ....................................................... 4

    III. .................................................................PROCEDURAL HISTORY
    ....................................................................................... 5

SUMMARY OF ARGUMENT ........................................................... 10

STANDARD OF REVIEW ............................................................... 12

    I. LEGAL STANDARDS RELEVANT TO FEDERAL JURISDICTION. . 12

        A. Twitter's Article III Standing Burden. .......................... 12

        B. A Removing Defendant Must Show That Its Removal Was Timely.
        ...................................................................................... 13

        C. Leave To Amend Should Be Freely Granted.................. 14

    II. LEGAL STANDARDS FOLLOWED BY THE WASHINGTON
        SUPREME COURT IN CONSTRUING A WASHINGTON STATUTE.
    ...................................................................................... 15

        A. Washington Statutory Construction Seeks The Meaning Of The
        Plain Text In Its Full Context. ...................................... 15

        B. Remedial, Consumer Protection Statutes Must Be Given Broad
        Construction To Effectuate Their Purpose................... 17

ARGUMENT ............................................................................... 18

    I. THE DISTRICT COURT LACKED JURISDICTION ................... 18

        A. The Trial Court Erred In Allowing Twitter's Untimely Removal 18

        B. The Trial Court Erred When It Denied Morgan's Motion To File
        A Second Amended Complaint.................................... 22

            1. There Was No Cognizable Prejudice To Twitter. .............23

            2. There Had Been No Undue Delay By Morgan...................25

            3. Morgan's Amendment Was Not Offered In Bad Faith...... 26

4. The Amendment Was Not Futile; Nor Did The FAC Weigh Against The SAC. ...............................................27

C. The Court Erred In Denying Morgan's Second Motion To Remand When No Claim Of Concrete Injury Remained In The Case. ................................................................ 28

1. The Court Only Found Article III Harm In Sales, Not Procurement. ................................................ 28

2. Morgan Abandoned The RCW 9.26A.140(1)(a) Sales Dispute. ....................................................... 29

3. A Moot Claim Does Not Support Federal Jurisdiction .......30

II. MORGAN PREVAILS ON THE MERITS OF HIS CLAIM. ........... 31

A. RCW 9.26A.140 Is A Remedial Consumer Protection Act. ..........32

B. The Statute's Definition Of "Telephone Record" Explicitly Includes Phone Numbers. ..........................................34

C. The Statute Proscribes Not Only False Or Fraudulent Conduct But Also "Deceptive Means." ........................................ 37

D. The Legislative History Dispels Any Doubt That Cell Phone Numbers Are Protected. ................................................ 40

CONCLUSION. .................................................................. 43

# TABLE OF AUTHORITIES

## CASES

*Adams v. King Cnty.*, 164 Wash. 2d 640 (2008) ......................................38

*Alderson v. Delta Air Lines, Inc.*, 2018 WL 5240811 (W.D. Wash. October 22, 2018) ......................................14

*Already, LLC v. Nike, Inc.*, 568 U.S. 85 (2013) ...................... 13

*Am. C.L. Union of Nevada v. Lomax*, 471 F.3d 1010 (9th Cir. 2006) ........................30

*Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997)........................30

*BankAmerica Pension Plan v. McMath*, 206 F.3d 821 (9th Cir. 2000)........................29

*Carlsen v. Global Client Solutions, LLC*, 171 Wash. 2d 486 (2011)..........................18

*Central Puget Sound Regional Transit Authority v. Airport Investment Company*, 186 Wash. 2d 336 (2016) ..................................16

*Columbia Riverkeeper v. Port of Vancouver USA*, 188 Wash. 2d 421 (2017) ......................................... 17

*Ctr. for Env't L. & Pol'y v. Dep't of Ecology*, 196 Wash. 2d 17 (2020) ....................38

*DCD Programs, Ltd. v. Leighton*, 833 F.2d 183 (9th Cir. 1987) ......................... 15, 27

*Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017)........................................29

*Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048 (9th Cir. 2003)................. 14, 27

*Foman v. Davis*, 371 U.S. 178 (1962) ......................................14

*Ford Motor Co. v. City of Seattle, Exec. Servs. Dep't*, 160 Wash. 2d 32 (2007) ................................................................. 37

*Frantz v. U.S. Powerlifting Fed'n*, 836 F.2d 1063 (7th Cir. 1987) ............................26

*Fraternal Ord. of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Ord. of Eagles*, 148 Wash. 2d 224 (2002) ........................................34

*Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125 (9th Cir. 2005) ........................ 13

*Gaus v. Miles, Inc.*, 980 F.2d 564 (9th Cir. 1992) ......................................43

*Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877 (9th Cir. 1999) ......................................26

*Guijosa v. Wal-Mart Stores, Inc.*, 101 Wash. App. 777 (2000)................................38

*Hansen v. Grp. Health Coop.*, 902 F.3d 1051 (9th Cir. 2018)..................................12

*Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wash. 2d 59 (2007)................................................................39

*Infuturia Glob. Ltd. v. Sequus Pharms., Inc.*, 631 F.3d 1133 (9th Cir. 2011) ..................................................................................................36

*Jametsky v. Olsen*, 179 Wash. 2d 756 (2014)....................................................18

*Jordan v. Nationstar Mortg. LLC*, 781 F.3d 1178 (9th Cir. 2015) .................14, 21, 22

*Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994) ..............12

*Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136 (9th Cir. 2013)...........14, 20

*Loeffelholz v. Univ. of Washington*, 175 Wash. 2d 264 (2012) ...................17

*Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985).........................36

*Panag v. Farmers Ins. Co. of Washington*, 166 Wash. 2d 27 (2009) ........................... 2

*Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081 (9th Cir. 2011) .......................13

*Railey v. Sunset Food Mart, Inc.*, 16 F.4th 234 (7th Cir. 2021) ..................14

*Roth v. CHA Hollywood Med. Ctr., L.P.*, 720 F.3d 1121 (9th Cir. 2013)............. 14, 21

*Shilling v. Nw. Mut. Life Ins. Co.*, 423 F. Supp. 2d 513 (D. Md. 2006) .................. 24

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016)....................................................12

*State v. Casey*, 81 Wash. App. 524, 528 (1996)................................................38, 40

*State v. Evans*, 177 Wash. 2d 186 (2013) .........................................................16

*State v. Pike*, 118 Wash. 2d 585 (1992) ...........................................................18

*State v. Roggenkamp*, 153 Wash. 2d 614 (2005) ............................................37

*State v. Superior Ct. of Pierce Cty.*, 104 Wash. 268 (1918) .........................17

*State, Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wash. 2d 1 (2002)................................................................................................ 16, 39

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) .........................................3

*Tyler Pipe Indus., Inc. v. State, Dep't of Revenue*, 96 Wash. 2d 785 (1982)................................................................................................37

*U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980) ................................30

*Underwood v. O'Reilly Auto Enterprises, LLC*, 342 F.R.D. 338 (D. Nev. 2022) ...............................................................................................24, 25

*United Fed'n of Churches, LLC v. Johnson*, 598 F. Supp. 3d 1084 (W.D. Wash. 2022) ....................................................................................... 27

*Velazquez Framing, LLC v. Cascadia Homes, Inc.*, 540 P.3d 1170 (Wash. 2024) .................................................................................... 17

*Walker v. Beard*, 789 F.3d 1125 (9th Cir. 2015) .............................. 30

*Wallingford v. Bonta*, 82 F.4th 797 (9th Cir. 2023) ......................... 30

*West Virginia v. EPA*, 597 U.S. 697 (2022) ..................................... 13

*Zivkovic v. S. California Edison Co.*, 302 F.3d 1080 (9th Cir. 2002) ....................... 23

## STATUTES

28 U.S.C. § 1332(d) .................................................................. passim

28 U.S.C. § 1446(b) .................................................................. 19, 20

9 U.S.C. § 205 ............................................................................... 35

RCW 19.250.010 .......................................................................... 40

RCW 19.86.020 ............................................................................ 38

RCW 19.86.920 ............................................................................ 18

RCW 2.08.010 ................................................................................ 1

RCW 26.55.010 ............................................................................ 34

RCW 31.20.040 ............................................................................ 35

RCW 48.02.068 ............................................................................ 34

RCW 9.26A.140 ..................................................................... passim

## RULES

Fed. R. Civ. P. 11 ......................................................................... 25

Fed. R. Civ. P. 15 ....................................................................... 8, 14

Fed. R. Civ. P. 9(b) ............................................................... 1, 30, 36

Wash. Super. Ct. Civ. R. 4 ................................................ 7, 13, 19, 21

Wash. Super. Ct. Civ. R. 9(b) .................................................... 1, 36

## CONSTITUTIONAL PROVISIONS

U.S. Const. Article III ........................................................................passim

## Jurisdictional Statement

Jurisdiction was proper in Spokane County Superior Court. *See* RCW 2.08.010. Forty-nine days after the case began, Twitter removed the matter to the Eastern District of Washington, citing 28 U.S.C. § 1332(d). This Court has appellate jurisdiction under 28 U.S.C. § 1291. The district court's final judgment disposed of all parties' claims. 1-ER-2. Morgan timely filed a notice of appeal. 4-ER-726.

Twitter failed to demonstrate that its removal was timely, depriving the District Court of statutory jurisdiction. Further, no later than June 2023, Morgan no longer alleged, and therefore the parties ceased to dispute, that Twitter had engaged in conduct that caused a harm cognizable under U.S. Const. Article III. From that point forward, Twitter could no longer carry its burden to show that a federal court had Article III jurisdiction.

## Statement of Issues

1. Whether the federal courts have jurisdiction over Morgan's allegation that Twitter violated RCW 9.26A.140(1)(b);

2. Whether Morgan alleged facts sufficient to show a violation of RCW 9.26A.140(1)(b);

3. Whether alleging a violation of RCW 9.26A.140(1)(b) must satisfy the pleading standard of either Wash. Super. Ct. Civ. R. 9(b) or corresponding (and effectively identical) Fed. R. Civ. P. 9(b).

## Statement Of The Case

### I. Overview

In 2006 the Washington Legislature enacted RCW 9.26A.140, prohibiting the use of "deceptive means" to procure any "telephone record." To deter such conduct, the statute imposed civil penalties, allowing recovery of "actual damages, including mental pain and suffering, or liquidated damages of five thousand dollars per violation, whichever is greater." RCW 9.26A.140(4). Twitter obtained the cell numbers of at least ten thousand Washington residents, while giving them literally thousands of assurances that Twitter would take steps to protect the privacy of user data, including those numbers. Instead, as shown in explosive testimony from Peter "Mudge" Zatko,[2] former head of information security for Twitter, which he presented to the United States Senate Judiciary Committee in 2022, Twitter routinely ignored its own policies and promises to customers, exploiting users' cell phone numbers to target advertising. Because Twitter's conduct—much of which it admitted to in public press releases and SEC filings—"had the capacity to deceive a substantial portion of the public," *Panag v. Farmers Ins. Co. of Washington*, 166 Wash. 2d 27, 47 (2009), Morgan brought suit under RCW 9.26A.140(1)(b) on behalf of Washington residents whose cell numbers Twitter obtained by deceptive means.

---

[2] "Mudge" is one of the best known, most famous, and most successful "white hat" hackers. Crediting him with identifying the buffer overflow vulnerability, the Department of Defense employed him for many years, granting him the highest possible security clearances. 3-ER-407.

This case does not belong in federal court. A case of first impression under a state statute, it was originally filed as a class action by plaintiff Darlin Gray, represented by the same counsel, in the Western District of Washington.[3] However, because the decision in *Trans Union LLC v. Ramirez*, 594 U.S. 413 (2021), raised the prospect that any federal court proceedings might be vacated if a court found that Gray and the class lacked Article III standing, Glen Morgan served on Twitter a virtually identical complaint, properly venued in Spokane County Superior Court. *See* RCW 4.12.025(1).

Apparently believing that service did not trigger the 30-day removal deadline, 3-ER-530, Twitter waited 49 days to serve a notice of removal. Morgan sought remand based both on the failure to timely remove as well as Twitter's failure to establish Article III jurisdiction. The district court denied the motion, ruling that (1) the complaint did not trigger the 30-day deadline for removal; and (2) while one of the statutory violations alleged in the complaint ("procurement") did not allege a concrete injury, the other statutory violation ("sales") alleged in the complaint did. Twitter filed a motion to dismiss for failure to state a claim. Morgan then moved to amend the complaint to omit the sales allegation, which motion was denied, finding that Twitter would be prejudiced by not obtaining a judgment on the merits. The district court then denied Morgan's renewed motion seeking remand based on the

---

[3] Because Gray assumed that Twitter would remove any state court complaint to federal court, Gray originally filed in federal court, even though Gray, like Morgan, sought only a remedy under state law.

mootness of the dispute that had permitted Article III jurisdiction. The court denied that motion and granted Twitter's motion to dismiss. This appeal followed.

## II.  Background Facts

On October 8, 2019, Twitter issued a press release admitting that "when [users] provided an email address or phone number for safety or security purposes (for example, two-factor authentication) this data may have inadvertently been used for advertising purposes, specifically in our Tailored Audiences and Partner Audiences advertising system." 3-ER-387. This conduct violated not only Twitter's privacy promises to users, but also a 2011 consent decree between Twitter and the FTC, in which Twitter had agreed to take steps to comply with its promises to secure user's private data. The FTC sought that consent decree in response to a 2010 security breach by Twitter and the ensuing discovery by the FTC that Twitter had made few, if any, provisions for data security despite assurances to the contrary.

Twitter, it turned out, never changed. While this litigation began in response to Twitter's October 2019 disclosure, subsequent events confirmed the merits of the claims beyond doubt.[4] After Twitter fired its senior security executive, Mudge made a whistleblower disclosure to the U.S. Congress in which he revealed that Twitter had never come into compliance with the 2011 consent decree. He testified that even as Twitter negotiated a second consent decree to resolve the FTC's claims arising from its 2019 disclosure—and during the pendency of this litigation over the same

---

[4] There was never any real doubt that Twitter had violated the statute. The fact allegations of the initial Complaint quoted Twitter's press releases and disclosures made to the SEC.

issues— it was widely recognized within the company that it would not be capable of complying with the new consent decree, either. 3-ER-431. Indeed, Mudge received requests from Twitter employees to violate data security assurances and the likely terms of the consent decree while it was being negotiated. 3-ER-430.

Despite widespread internal knowledge that Twitter did not, and apparently could not, actually provide basic security to users' data, including phone numbers, it nonetheless regaled prospective users with promises about data protection. According to Mudge in 2022, he found over 20,000 such assurances in the previous five years, with no evidence that Twitter had ever taken a single step to fulfill even one. 3-ER-493. Before he was fired, Mudge set his team a goal:

> **Ensuring that Emails and Phone Numbers Collected Through Security Flows are Not Used in Advertising Products:** Technical means are beginning to roll out to ensure that we do not misuse emails and phone numbers. Until those are in place, we are still relying on fragile infrastructure and processes to prevent a recurrence of our prior misuse. Delivering technical solutions in 2022 will be key to long term compliance with our obligations.

3-ER-494. Mudge's goal may never be met, but this litigation seeks to hold Twitter to account for its earlier failures, seeking the remedy created by the Washington Legislature.

## III. PROCEDURAL HISTORY

Relying on Twitter's October 2019 disclosure, on September 21, 2020, Marlin Gray sued, alleging that Twitter had wrongfully procured users' telephone numbers,

violating RCW 9.26A.140(1)(b). She further alleged that discovery could reveal that Twitter sold those records, violating RCW 9.26A.140(1)(a).[5]

Gray sought statutory damages, invoking diversity jurisdiction under 28 U.S.C. § 1332(d)(2) because class damages exceeded $5,000,000. Gray served Twitter on September 23. It defaulted, then appeared on October 20. On April 23, 2021, the parties concluded briefing on Twitter's Motion to Dismiss. A Report & Recommendation from the United States Magistrate (which was never acted upon by the trial judge) was issued on March 17, 2021, to which objections were filed, along with a Motion to Certify Questions. On June 25, 2021, the U.S. Supreme Court issued its decision in *TransUnion*, reversing a decision of this Court and changing the legal landscape governing Article III standing for statutory damages claims. Twitter nonetheless insisted that, in its view, the *Gray* complaint properly invoked federal jurisdiction. 3-ER-559. The *Gray* case remained inactive for the next thirteen months.

During that delay, the approaching expiration of the statute of limitations became a concern due to the intervening decision in *TransUnion*. Regardless of what the *parties* believed with respect to subject matter jurisdiction, a trial or appellate

---

[5] Gray, and thereafter Morgan, alleged on information and belief that a reasonable opportunity for discovery would reveal that Twitter had, indeed, revealed phone numbers to advertisers who paid extra for phone number-based ad targeting, based on the reasonable conclusion that advertisers would seek proof that they got the benefit of the bargain. Mudge's disclosure, discussed in greater detail below, confirmed the likely veracity of that reasonable belief.

court might find no standing and dismiss, risking a bar to the claims for all class members. Fellow class member Glen Morgan therefore initiated an identical lawsuit in Spokane County Superior Court[6] on April 1, 2022, relying on Wash. Super. Ct. Civ. R. 4 and starting the clock for removal. Other than the venue and the name of the class representative, the difference between the *Gray* complaint and *Morgan* complaint was that Morgan did not recite the jurisdictional dollar minimum found in 28 U.S.C. § 1332(d)(2) (irrelevant to state court jurisdiction). All parties and the Court agreed that the complaints were otherwise identical in relevant respects. Correspondence with Twitter's counsel confirmed that Twitter planned to remove. 3-ER-530.

After the removal deadline had passed, Morgan's counsel informed Twitter that it had missed the removal deadline, and asked Twitter to cooperate in entering a stay in the still-stagnant *Gray* matter, which the parties could then dismiss after resolving *Morgan* in state court. 3-ER-623. Faced with the realization that it had miscomprehended the operation of CR 4 and missed the deadline to remove a case it had already acknowledged as removable, Twitter nonetheless removed, forty-nine days after Morgan was initiated. 4-ER-647. Although *Morgan* alleged the same class as *Gray*, and sought the same $5,000 per capita statutory damages, Twitter claimed its removal was timely because it didn't actually *know* whether Morgan's allegations met the monetary jurisdictional threshold under the Class Action Fairness Act

---

[6] Morgan's state court filing protected the class members' interests, assuring that if a future court found no federal jurisdiction, the case would be remanded to a timely state court action, avoiding a statute of limitations defense.

("CAFA"), 28 U.S.C. § 1332(d)—despite having earlier insisted *Gray* belonged in federal court! Morgan sought remand, highlighting Twitter's obvious pre-existing knowledge of the alleged class size and that the damages met the CAFA threshold, Twitter's late removal, and its failure to demonstrate Article III jurisdiction. 3-ER-625.

While awaiting a remand decision, Morgan learned of Mudge's explosive disclosures, which provided extensive support for the Complaint as well as an additional basis for extending the class period. Morgan immediately drafted a First Amended Complaint. In addition to buttressing the fact allegations for violations of both RCW 9.26A.140(1)(a) and (1)(b) with the Mudge disclosure, the FAC expanded the class definition. On February 21, 2023, Morgan filed the FAC.[7] 3-ER-378. On May 2, 2023, the Court heard renewed argument on the Motion to Remand, and on May 5, 2023, denied it. 1-ER-65. The Court agreed with Twitter that it could remove more than 30 days after service where the complaint did not state a dollar figure or class size, regardless of Twitter's admitted prior knowledge of the class size, and thus amount in controversy, and Twitter's stated belief that an identical complaint was properly subject to federal jurisdiction. The court found that Twitter was entitled to the second thirty-day window for removal, disregarding Twitter's failure to identify the date upon which it "learned" that the case was removable, and

---

[7] Contrary to the trial court's characterization, Morgan timely filed the FAC. *See* Rule 15(a)(1)(B) and 2023 Notes (non-substantive amendment to eliminate the chance a future court agreed with the "untoward" position of the court below on timeliness under earlier Rule 15).

that it removed the case within 30 days of that date. It further held that Twitter **had** carried its Article III burden, because fact allegations of phone number sales (violating RCW 9.26A.140(1)(a)) showed injury-in-fact under *TransUnion*. 1-ER-80. On the other hand, the trial court also held that Twitter **failed** to show Article III harm from fact allegations of number procurement, the alleged violation of RCW 9.26A.140(1)(b).[8] 1-ER-76.

On June 2, 2023, Twitter filed a Motion to Dismiss the FAC. 2-ER-325. On June 12, Morgan filed a Motion for Leave to file a Second Amended Complaint ("SAC"). 2-ER-287. Filed just ten days after the very first Rule 12(b)(6) motion in the case, **before** any substantive decision had ever been issued, and **before** any discovery, the SAC proposed to **delete** fact allegations, **eliminate** one of two disputes giving rise to the claim under RCW 9.26A.140(4), and **remove** any claim of reliance on the state's "baby RICO."[9]

---

[8] The Court's Order contains numerous errors bearing on subsequent pleadings, including the SAC. It repeatedly characterized Morgan's briefing as positively arguing he had not alleged Art. III harm, in supposed contradiction to the *Gray* filing. In fact, Morgan took no position, arguing instead that **Twitter** had failed to meet its Art. III burden. If *TransUnion* had never called into question federal jurisdiction over *Gray*, the *Morgan* filing would have been unnecessary.

[9] Morgan's SAC sought to remove reliance on Chapter 9A.82 RCW, the state's Criminal Profiteering Act, to demonstrate beyond doubt that RCW 9.26A.140(4) was the basis of the cause of action. Morgan did so in response to the statement of the court below, in its order denying Morgan's first motion to remand, erroneously and inexplicably stating that RCW 9.26A.140 did not create a cause of action. 1-ER-74 ("RCW 9.26A.140 does not provide a cause of action for a tort; it is an anti-

After briefing, including a sur-reply on Article III issues raised by the SAC and briefing, the Court denied the Motion. 1-ER-52. It characterized the FAC as untimely, the SAC as sought in bad faith, and (ignoring thousands of pages of exhibits supporting the allegations) accused Morgan's counsel of having apparently failed to conduct an adequate investigation before filing either the Complaint or FAC. It also held that Twitter would be prejudiced by having to re-file its Motion to Dismiss, and by not having a dispositive ruling on the sales claim. 1-ER-59.

Morgan then filed a Motion to Remand the FAC on the grounds that, regardless of the contents of that operative pleading, he had nonetheless abandoned the fact allegations of a violation of RCW 9.26A.140(1)(a), the only dispute the court had found created Article III standing. 2-ER-233. With no live fact dispute whether or not Twitter had engaged in conduct that the court held could cause injury-in-fact, the court lacked jurisdiction. The court denied the second motion to remand on November 22, 2023, with its final order dismissing the FAC without leave to amend. 1-ER-3. Morgan then timely appealed.

## Summary of Argument

The trial court lacked jurisdiction, and therefore should have remanded the case, for two reasons. First, Twitter did not timely remove the case from state court. Mistakenly believing that the first 30-day clock did not start until the case was filed, Twitter waited more than 30 days after the complaint was served. It sought to evade

---

pretexting law.") In support, in lieu of the statutory text, the court cited legislative history, namely, a House Bill Report. That bill report, however *also* stated that the statute created a cause of action and statutory damages.

its error by claiming that it did not "know" from the face of the complaint that the case was removable, despite evidence to the contrary, including its own prior insistence that an earlier, identical complaint was properly brought in federal court. Twitter hoped to rely on the second, judicially created 30-day window that opens when a defendant (otherwise unsure of removability) first learns of CAFA removability. But Twitter never even attempted to show the date it first knew the case was removable, claiming erroneously that it could remove "at any time."

The second reason remand was required is that when Morgan abandoned the allegation that Twitter sold his cell number, and only sought relief for improper procurement of his cell number (and sought leave to amend the complaint accordingly), there was no longer an allegation of concrete injury that provided a basis for CAFA jurisdiction. The trial court should therefore have remanded the case to state court.

On the merits, should this Court conclude that the district court had jurisdiction, Morgan stated a claim under the Washington statute prohibiting the procurement of a "telephone record" by deceptive means. As a remedial statute, RCW 9.26A.140 should be given a broad reading, and cell phone numbers clearly fall within the plain text of the statute, in the definition of a "telephone record." This conclusion is amply confirmed by the Final Bill Report upon which legislators relied to vote in favor of the legislation. Twitter's admission that it obtained cell numbers by promising to use them only for authentication purposes, but in fact subsequently used them to target advertising, constitutes precisely the kind of conduct that the statute was intended to deter, and for which a civil remedy was authorized.

**STANDARD OF REVIEW**

## I.   LEGAL STANDARDS RELEVANT TO FEDERAL JURISDICTION.

Twitter bears the burden of demonstrating that this Court's exercise of jurisdiction satisfies both Article III and the Class Action Fairness Act. "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree. It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Therefore, "the removing defendant bears the burden of overcoming the strong presumption against removal jurisdiction." *Hansen v. Grp. Health Coop.*, 902 F.3d 1051, 1057 (9th Cir. 2018) (cleaned up).

### A.   Twitter's Article III Standing Burden.

Twitter must show a live fact dispute whether Plaintiffs have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Because the complaint seeks statutory damages, Twitter must demonstrate that it alleges facts which, if true, caused Morgan to suffer a concrete harm. "No concrete harm, no standing. Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms including (as relevant here) reputational harm." *TransUnion*, 594 U.S. at 417.

Twitter's burden remains throughout the litigation, increasing at every stage. "For a case to fall within the parameters of [this Court's] limited judicial power, it is not enough that there may have been a live case or controversy when the case was decided by the court whose judgment we are reviewing. Rather, Article III requires that a live controversy persist throughout all stages of the litigation. Where this condition is not met, the case has become moot, and its resolution is no longer within our constitutional purview." *Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1128–29 (9th Cir. 2005) (cleaned up). A "case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Of course, no party has a legally cognizable *federal* interest in the outcome of a case that does not allege an Article III injury-in-fact. *TransUnion*, 594 U.S. at 423.

The status at the outset is irrelevant, as are the contents of the operative pleading. "Whether the dispute between the parties was very much alive when suit was filed … cannot substitute for the actual case or controversy that an exercise of this court's jurisdiction requires." *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011). Mootness "addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit." *West Virginia v. EPA*, 597 U.S. 697, 719 (2022).

### B.    A Removing Defendant Must Show That Its Removal Was Timely.

Serving an unfiled Washington Superior Court complaint under CR 4 starts the federal removal clock. *See, e.g.*, *Alderson v. Delta Air Lines, Inc.*, 2018 WL

5240811 (W.D. Wash. October 22, 2018). Whether or not an action is facially removable, triggering the 30-day deadline upon service, is a question of fact. "The statute requires a defendant to apply a reasonable amount of intelligence in ascertaining removability." *Kuxhausen v. BMW Fin. Servs. NA LLC*, 707 F.3d 1136, 1140 (9th Cir. 2013). The four corners of the complaint alone are not the final word on whether an action is demonstrably removable. "A defendant should not be able to ignore pleadings or other documents from which removability may be ascertained and seek removal only when it becomes strategically advantageous for it to do so." *Roth v. CHA Hollywood Med. Ctr., L.P.*, 720 F.3d 1121, 1125 (9th Cir. 2013) (emphasis added). Further, "when it comes to removal, a defendant can be held to information about its own operations *that it knows or can discern with ease*." *Railey v. Sunset Food Mart, Inc.*, 16 F.4th 234, 241 (7th Cir. 2021) (emphasis added). Finally, "a defendant may remove a case from state court within thirty days of *ascertaining* that the action is removable under CAFA . . ." *Jordan v. Nationstar Mortg. LLC*, 781 F.3d 1178, 1180 (9th Cir. 2015) (emphasis added).

### C.    Leave To Amend Should Be Freely Granted.

Courts must "freely give leave [to amend] when justice so requires." Rule 15(a)(2). While the decision to grant or deny leave is within the sound discretion of the trial court, *Foman v. Davis*, 371 U.S. 178, 182 (1962), the primary consideration is whether the non-moving party would suffer prejudice. "Absent prejudice, or a strong showing of any of the remaining … factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (emphasis in original). "Rule 15's policy of

favoring amendments to pleadings should be applied with extreme liberality." *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 (9th Cir. 1987) (cleaned up).

## II.   Legal Standards Followed By The Washington Supreme Court In Construing A Washington Statute.

A court construing a Washington statute begins with the text, and ends there if it finds the text unambiguous. However, as the Washington Supreme Court has made clear, the court does not read any portion of the statute's text in isolation. Instead, the court reads the entire text, considering the context of the specific enactment, prior enactments, and related statutes. Where the act provides a remedy against a wrong, the statute is remedial and must be broadly construed to effectuate its purpose.

### A.   Washington Statutory Construction Seeks The Meaning Of The Plain Text In Its Full Context.

The Washington Supreme Court has explained the purpose of statutory interpretation and the proper method for discerning the legislature's intent:

> The purpose of statutory interpretation is to determine and give effect to the intent of the legislature. … When possible, we derive legislative intent solely from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole. … Plain language that is not ambiguous does not require construction. … If more than one interpretation of the plain language is reasonable, the statute is ambiguous, and we must then engage in statutory construction. … We may then look to legislative history for assistance in discerning legislative intent.

*State v. Evans*, 177 Wash. 2d 186, 192-93 (2013). The process described in *Evans* follows the clarifying instructions from the Supreme Court in an earlier case, emphasizing that the plain text / plain meaning rule does not allow a court to isolate words or phrases from their context and thereby arrive at a meaning that does not reflect the legislative intent manifested by the statute when read as a whole:

> The plain meaning rule requires courts to consider legislative purposes or policies appearing on the face of the statute as part of the statute's context. In addition, background facts of which judicial notice can be taken are properly considered as part of the statute's context because presumably the legislature also was familiar with them when it passed the statute. Reference to a statute's context to determine its plain meaning also includes examining closely related statutes, because legislators enact legislation in light of existing statutes.

*State, Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wash. 2d 1, 11 (2002); *see also Central Puget Sound Regional Transit Authority v. Airport Investment Company*, 186 Wash. 2d 336, 346 (2016) ("If the language is unambiguous, we give effect to that language and that language alone because we presume the legislature says what it means and means what it says"). The Court's emphasis on statutory context in the interpretive process reflects Washington's progressive-era constitution that differs greatly from the federal model. Importantly, "No bill shall embrace more than one subject, and that shall be expressed in the title." Wash. Const. art. II, § 19. The Washington Legislature cannot resort to omnibus bills with acronymic titles. As such, the full statutory context is relevant to the meaning of selected text.

Although the Court often declines invitations to examine legislative history if it concludes that the text is unambiguous, it does not appear to have ***ever*** imposed

on a statute its own "plain text" construction that is contradicted by the bill report.[10] Instead, it often confirms its construction of unambiguous statutes by checking it by comparison to the Final Bill Report.[11] *See, e.g.*, *Velazquez Framing, LLC v. Cascadia Homes, Inc.*, 540 P.3d 1170, 1173 (Wash. 2024) ("Even if the plain language of our lien statutes was ambiguous, legislative history leads to the same conclusion …" (quoting the bill reports)); *Loeffelholz v. Univ. of Washington*, 175 Wash. 2d 264, 272 (2012) (construing the plain language, then confirming by reference to the final bill report); *Columbia Riverkeeper v. Port of Vancouver USA*, 188 Wash. 2d 421, 440 (2017) (reviewing the bill report to confirm the plain text analysis).

### B. Remedial, Consumer Protection Statutes Must Be Given Broad Construction To Effectuate Their Purpose.

Perhaps the oldest rule of construction for Washington statutes is that "statutes providing remedies against either public or private wrongs are to be liberally construed." *State v. Superior Ct. of Pierce Cty.*, 104 Wash. 268, 272 (1918). This rule, almost as old as the state itself, conditions the equally applicable plain text rule. RCW 9.26A.140 provides a remedy against a private wrong, and therefore must

---

[10] Although in earlier orders, the court below relied on its mistaken readings of legislative history, *see supra* n. 9, in its final order it reversed course and pointedly opined that it would not consider at the Final Bill Report or other legislative history. Morgan's briefing demonstrated beyond doubt that the construction imposed by the court below is completely contradicted by the Final Bill Report, all earlier bill reports, and the amendment history, as detailed in Section III.D below.

[11] Bill reports are drafted contemporaneously with the initial bill, redrafted with every round of amendment, and accompany each bill throughout the Legislative process.

be liberally construed in favor of Morgan and other Washington residents. This rule of construction is uniformly applied to Washington statutes: "We construe remedial consumer protection statutes, such as the DPCA, liberally in favor of the consumers they aim to protect." *Jametsky v. Olsen*, 179 Wash. 2d 756, 765 (2014). Similarly, and cited in *Jemtsky*, because it is a remedial statute "the debt adjusting statute should be construed liberally in favor of the consumers it aims to protect," *Carlsen v. Global Client Solutions, LLC*, 171 Wash. 2d 486, 498 (2011). So, too, the remedial Automotive Repair Act "is to be liberally construed to further this legislative purpose." *State v. Pike*, 118 Wash. 2d 585, 591 (1992). In some instances, this broad rule of construction is placed into the statutory text, as in the Consumer Protection Act. *See* RCW 19.86.920. But with or without explicit legislative direction, beginning at least as early as 1918, courts broadly construe remedial Washington statutes.

## Argument

## I. The District Court Lacked Jurisdiction

### A. The Trial Court Erred In Allowing Twitter's Untimely Removal

Twitter failed to carry its burden to show that it removed within thirty days of ascertaining that the *Morgan* complaint was removable. In fact, Twitter refused to state ***when*** it ascertained removability. Such a statement is required by this Court's precedents holding that, even if the defendant is unsure of removability based on the face of the complaint (and other knowledge available to it), a defendant is required to remove within 30 days of ascertaining removability. Twitter did not (and apparently could not) carry its burden to show timely removal when it refused to identify the date on which it first learned that fact. There is no statement in the

record below, anywhere, confirming the date on which Twitter first determined the action was removable. Because Twitter never attempted to show that it removed within thirty days of ascertaining removability, Twitter failed to satisfy its burden to show that its late removal was actually timely under CAFA.

Upon receipt of Morgan's Complaint, Twitter knew that the class alleged was identical to the class alleged in the earlier-filed *Gray* complaint, seeking over $5,000,000 in statutory damages, a complaint which Twitter had opined properly belonged in federal court. Twitter called the Morgan Complaint a "copycat action" to *Gray*. 3-ER-589. Twitter had earlier professed its view that federal jurisdiction was appropriate over *Gray*. 3-ER-559. The only thing Twitter did *not* know was that the clock for removal had already started running by virtue of service, even without filing. As Twitter's counsel put it on April 27, "We expect that we may seek to try and remove the Morgan v. Twitter case to federal court if the case proceeds. As to timing of removal, we would prefer to avoid a fight over it, especially given the posture of the case—it's not yet been filed (***presumably to avoid triggering court deadlines***). So, we wanted to know whether you will agree that we do not yet have to seek removal, until at least ***after it is filed*** and serve a paper that triggers a 30-day deadline." 3-ER-581 (emphasis added). But service had already triggered the 30-day deadline. Apparently unaware of the operation of CR 4, it removed late. Morgan sought remand, putting Twitter to its burden of demonstrating that it had timely removed, forty-nine days after the lawsuit was initiated. The court erred in finding that Twitter carried that burden.

Twitter defended its late removal, contending that because the complaint did not expressly allege an amount in controversy or a class of more than 1,000 persons, the first 30-day clock (28 U.S.C. § 1446(b)(1)) did not commence. It argued that where the four corners of a complaint do not demonstrate the CAFA amount-in-controversy, under 28 U.S.C. § 1446(b)(3) a defendant may remove a case under CAFA "at any time." But where a complaint alleges *sufficient facts* to show jurisdiction, the 30-day clock starts immediately. The *Morgan* complaint did allege sufficient facts, not least because Twitter already knew, and had acknowledged in writing to Morgan's counsel, that a class identified as "All Washington persons who provided a telephone number to Twitter associated with a Twitter account prior to October 8, 2019"[12] was sufficiently numerous that, at $5,000 per head statutory damages, jurisdiction existed. 3-ER-559.

Twitter was simply wrong in arguing that the first 30-day clock only starts when the complaint contains an explicit allegation of the amount in controversy. The statute "requires a defendant to apply a reasonable amount of intelligence in ascertaining removability." *Kuxhausen*, 707 F.3d at 1140 (citation omitted). The complaint, *on its face*, contained sufficient information which, when read with "a reasonable amount of intelligence," made it clear to Twitter that the case was removable.

The court also erred in finding that Twitter could remove based upon the second 30-day window, commencing when a defendant first *knows* that the case is

---

[12] *Morgan* altered the class from *Gray* by a few days, to September 19, 2019.

removable. *See* 28 U.S.C. § 1446(b)(3); *Roth*, 720 F.3d at 1125; *Jordan*, 781 F.3d at 1180 ("a defendant may remove a case from state court **within thirty days of ascertaining** that the action is removable under CAFA") (emphasis added). Here, too, Twitter failed to carry its burden to show timeliness. Even if the original 30-day window was not applicable because Twitter did not *know* that the case was removable (despite Twitter's clear belief that the case was removable, and its stated intention to remove), Twitter could only utilize this second window by demonstrating that it removed within thirty days of *learning* that the case was removable. Twitter did not do so; instead, it steadfastly refused identify the date it first "learned" that the class size exceeded 1,000 members. It erroneously claimed that, according to *Roth*, where the four corners of the complaint do not contain express allegations creating removability, the defendant may remove "at any time." But *Roth* does not hold that in CAFA cases the defendant can remove "at any time." Twitter lifted language from *Roth* out of context. *Roth* used the "at any time" language to distinguish CAFA—which does not have an outer limit for removal—from other types of diversity cases in which removal must occur within a year from commencement of the action. *Roth*, 720 F.3d at 1126. *Jordan*, by contrast, makes explicit that the date of Twitter's first knowledge of removability opens another 30 day window, which then closes. To carry its burden to show that was within that window, Twitter had to state when the window opened—when it first learned that the case was removable—so that it could satisfy its burden of showing that the case was removed within 30 days of that date. Twitter did not, because it could not, because it had known from the moment of receipt that the Complaint was removable—as would

any person, because the Complaint itself was not "indeterminate" as to the class size.

Twitter's silence on this point is likely explained by the inability to produce any credible evidence that during the 49 days between the service of the complaint and Twitter's removal Twitter learned anything new that triggered a new 30-day window. Instead, Twitter submitted a declaration of Don Hoffman, a "Senior Staff Software Engineer," who testified as to his analysis which determined the class exceeded 10,000 persons. Significantly, Hoffman refused to say the date on which he performed that analysis. Regardless of the reason for Twitter's silence, its omission of this critical element is fatal to Twitter meeting its burden to show removal within 30 days of ascertaining removability, as required by *Jordan,* 781 F.3d 1178. Thus, even if Twitter were entitled to avoid the first 30-day clock, it failed to meet its burden to show that it removed within the second 30-day clock.[13] The court erred in not remanding for untimely removal.

## B. The Trial Court Erred When It Denied Morgan's Motion To File A Second Amended Complaint.

Even if the original removal was timely, Twitter could no longer show the propriety of Article III jurisdiction when Morgan abandoned the only claim alleging a concrete harm—a necessary element of standing under *TransUnion.* Morgan attempted to make a record of his abandonment by seeking leave to amend the

---

[13] Obviously, Twitter knew upon receipt of the *Morgan* complaint that it was removable. It had admitted as much. It was not ignorant of the fact of removability, but only ignorant of the legal rule that service initiates a state action under CR 4.

Complaint, removing the "sales" allegation and leaving only the "procurement" claim. But the trial court erroneously denied leave to amend the complaint.

The Court's error in denying leave to file the SAC is ***also*** dispositive of this appeal. Neither Twitter nor the court below could identify any prejudice sufficient to justify denying such leave. Under Ninth Circuit precedent, such an amendment is presumptively permissible, and can only be denied for substantial prejudice to the non-moving party. The circumstances here do not meet any pre-existing Ninth Circuit standard for prejudice to Twitter. Morgan has been unable to identify a single instance in any federal district court in which amendment was denied ***before*** discovery, or ***before*** any ruling on a 12(b) motion. Here, where the early motion also removed allegations (unlike most proposed amendments that would add claims or parties), the Order finding untimeliness, bad faith, and prejudice constitutes an abuse of discretion.

### 1.    There Was No Cognizable Prejudice To Twitter.

Even though other factors can be considered in applying Rule 15 with "extreme liberality," the primary factor is prejudice. An amendment may be denied for prejudice where it would require additional discovery and comes so late as to cause undue delay or require extending discovery. *See, e.g.*, *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1087 (9th Cir. 2002). However, "[t]he potential for some prejudice does not suffice to deny leave to amend. The Ninth Circuit has repeatedly stated that the prejudice must be ***substantial***. ... The existence of prejudice is generally mitigated where the case is still in the discovery stage, no trial date is pending, and no pretrial conference has occurred." *Underwood v. O'Reilly Auto*

*Enterprises, LLC*, 342 F.R.D. 338, 343 (D. Nev. 2022) (cleaned up, emphasis added). Here, discovery had not begun and the SAC *removed* fact allegations to reduce the potential scope of discovery.

In opposing Plaintiff's motion for leave to amend, Twitter's sole claim of prejudice is this: "[G]ranting Plaintiff's Motion will prejudice Twitter by delaying this case and its resolution, requiring another round of unnecessary briefing, and forcing Twitter to expend resources to re-file a substantially similar Motion to Dismiss as it has already filed (ECF No. 43)—not to mention the judicial resources that will be wasted." 2-ER-280.

In denying the Motion to Amend, the trial court adopted Twitter's claim that requiring a revised brief was prejudicial, but offered no evaluation of whether such prejudice was substantial. However, the trial court offered its own suggestion as to possible prejudice: "[T]he granting of Plaintiff's instant motion would eliminate Defendant's ability to have Claim 2 addressed on the merits. The Court finds doing so would prejudice Defendant." Twitter never advanced this argument, for good reason: in cases where the defendant complains that amending a complaint to withdraw an allegation would prevent dismissal with prejudice, trial courts condition leave to amend upon the Plaintiff's consent to have the claim dismissed with prejudice. *Shilling v. Nw. Mut. Life Ins. Co.*, 423 F. Supp. 2d 513, 516 (D. Md. 2006). Morgan would have freely consented to such a condition, had it been proposed either

24

by Twitter or by the Court.[14] But the court below refused to even countenance such a proposition to mitigate any "prejudice" to Twitter.

It was an abuse of discretion to deny leave to amend a complaint before any discovery had taken place, long before a scheduling order had been entered, where the sole prejudice to the non-moving party would be refiling a 12(b)(6) motion after deleting portions of the brief and regenerating the Tables of Contents and Authorities. No court has ever found that minimal imposition on Twitter to constitute prejudice. None of the other factors considered in ruling on a motion for leave to amend a complaint justify the court's order, as the balance of this section explains.

### 2. There Had Been No Undue Delay By Morgan.

"A strong presumption against a finding of undue delay exists when a case is *still in discovery*. Moreover, it is well-settled within the Ninth Circuit that any undue delay in seeking amendment is not, in itself, sufficient grounds to deny leave to amend." *Underwood*, 342 F.R.D. at 346 (cleaned up, emphasis added). The SAC was presented ten days after a 12(b)(6) motion and during a discovery stay, making the

---

[14] It is also likely that Twitter did not make this argument because it would not need a ruling from the Court that the dismissal of the sales claim would be with prejudice. Once a final judgment was entered on the merits of the procurement claim, the abandoned sales claim would be effectively dismissed with prejudice because the principle of *res judicata* would bar its assertion in a new suit. Thus, even with the trial court's *sua sponte* suggestion of prejudice, Twitter utterly failed to establish the "substantial prejudice" required to deny leave to amend.

undue delay factor inapplicable under Ninth Circuit precedent. The Court's delay finding was an abuse of discretion.

### 3. Morgan's Amendment Was Not Offered In Bad Faith.

Bad faith arises where "plaintiff merely is seeking to prolong the litigation by adding new but baseless legal theories." *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 881 (9th Cir. 1999). The SAC *removed*, not added, a legal theory—the opposite of bad faith.[15] The SAC could not prolong litigation where no scheduling order had been entered, no discovery commenced, and the amendment would have reduced the complexity of the case by eliminating fact allegations and lines of potential discovery. It meets no Ninth Circuit standard for bad faith.

---

[15] The trial court's order also *sua sponte* suggested that in conceding the lack of merit in the allegations of improper sales of telephone records, Morgan was effectively admitting that his pre-filing investigation was inadequate, violating Fed. R. Civ. P. 11. 1-ER-61. However, where the complaint alleged conduct that could only be proven through discovery, and no discovery had yet been permitted, the accusation of a Rule 11 violation was unwarranted. *Frantz v. U.S. Powerlifting Fed'n*, 836 F.2d 1063, 1068 (7th Cir. 1987) ("Rule 11 must not bar the courthouse door to people who have some support for a complaint but need discovery to prove their case"). These remarks also disregarded the extensive support for the allegation found in the Mudge disclosure and thousands of pages of exhibits attached to the FAC, suggesting widespread, profit-seeking disregard by Twitter employees of every existing company privacy policy.

### 4. The Amendment Was Not Futile; Nor Did The FAC Weigh Against The SAC.

Amendment is typically called "futile" where a complaint is initially found to have no merit and the Plaintiff proposes to add theories or parties that do not change the court's prior dispositive analysis. In other words, a futile amendment "merely restates the same facts using different language, or reasserts a claim previously determined." *DCD Programs*, 833 F.2d at 188. No such circumstance obtained here. The amendment *removed* fact allegations, before any discovery or ruling on the merits of the FAC. It was not futile under Ninth Circuit precedent.

Courts similarly consider whether a proposed amendment constitutes a subsequent attempt to plead around an adverse dispositive ruling. If not, leave to amend is granted. *See, e.g.*, *Eminence*, 316 F.3d at 1053 (allowing a fourth amendment because "[t]his is not a case where plaintiffs took 'three bites at the apple' by alleging and re-alleging the same theories in an attempt to cure pre-existing deficiencies. … Consequently, it is not accurate to imply that plaintiffs had filed multiple pleadings in an attempt to cure pre-existing deficiencies"); *United Fed'n of Churches, LLC v. Johnson*, 598 F. Supp. 3d 1084, 1103 (W.D. Wash. 2022) (granting a third amendment where "although [plaintiff] has amended its complaint twice, it has not yet had the benefit of this court's view of the law governing actionable losses under the [relevant statute]"). Here, the Complaint was the basis of the Motion to Remand, and the timely FAC was targeted by a 12(b)(6) motion just ten days before the Motion to Amend. Moreover, motions for leave to amend typically *add* allegations or parties. If the Plaintiff seeks to *delete* allegations, the only reason for

denying leave is if the court has *already* determined the complaint lacks merit. Subtracting from zero still leaves zero. Here, by contrast, the merits of the complaint had yet to be determined. In sum, the court disregarded the Rule 15 factors, and abused its discretion in denying amendment.

## C. The Court Erred In Denying Morgan's Second Motion To Remand When No Claim Of Concrete Injury Remained In The Case.

The Complaint and FAC alleged two different fact patterns leading to violations of RCW 9.26A.140. First, Morgan alleged that Twitter had used false or deceptive means to procure phone numbers, a violation of RCW 9.26A.140(1)(b). As to this set of facts, the court's first remand order held that Twitter had ***not*** shown that the allegations, if true, caused Morgan an Article III harm. Consequently, when Morgan abandoned the only other dispute in the FAC (whether Twitter had sold telephone records in violation of RCW 9.26A.140(1)(a)), Twitter could no longer carry its burden to show a constitutional "Case" or "Controversy."

### 1. The Court Only Found Article III Harm In Sales, Not Procurement.

Opposing the first remand, Twitter attempted to justify its removal of the case to federal court by arguing that both claims raised by the Complaint (and the FAC) alleged Article III injury. "Defendant argues that the cause of action Plaintiff has brought under RCW 9.26A.140 … is closely analogous to the common law torts of disclosure of private information and intrusion upon seclusion." 1-ER-76. The trial court found that only the first claim (disclosure of private information) alleged Article III injury, and rejected Twitter's second argument: "There are no facts

plead[ed] that would demonstrate an alleged invasion of Plaintiff's private solitude. … Defendant's argument that a violation of RCW 9.26.140 is closely analogous to the common law tort of intrusion upon seclusion is ***without merit***." 1-ER-76 (emphasis added). However, the Court found that Twitter ***did*** identify potential Article III harm in sales allegations: "Plaintiff alleges that Defendant disseminated the private information associated with his and other Twitter users' cell phone numbers, which include the numbers themselves and metadata contained within to third-party advertisers." 1-ER-77. The Court found that this sufficed for Article III standing, akin to *Eichenberger v. ESPN, Inc.*, 876 F.3d 979 (9th Cir. 2017). 1-ER-78. "Because RCW 9.26A.140 codifies a substantive right involving privacy in certain telephone records, the Court finds that the cause of action available under RCW 9.26A.140 is analogous to the federally recognized injury of disclosure of private information and it has a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts as required by *TransUnion*." 1-ER-79.

### 2. Morgan Abandoned The RCW 9.26A.140(1)(a) Sales Dispute.

Regardless of the operative pleading, Morgan abandoned the sales issue, the only constitutionally cognizable dispute between the parties. "A party abandons an issue when it has a full and fair opportunity to ventilate its views with respect to an issue and instead ***chooses a position that removes the issue from the case***." *BankAmerica Pension Plan v. McMath*, 206 F.3d 821, 826 (9th Cir. 2000) (cleaned up, emphasis added). Morgan removed from the litigation any contention that Twitter violated RCW 9.26A.140(1)(a). In the SAC briefing, he "deliberately declined to

pursue an argument by taking a position that conceded the argument or removed it from the case." *Walker v. Beard*, 789 F.3d 1125, 1133 (9th Cir. 2015). He "instead chooses a position that removes the issue from the case." *BankAmerica Pension Plan*, *supra*.

### 3. A Moot Claim Does Not Support Federal Jurisdiction.

A moot claim cannot support Article III jurisdiction:

> The constitutional requirement that federal courts resolve only actual, ongoing cases or controversies applies through all stages of federal judicial proceedings, trial and appellate. It is not enough that a dispute was very much alive when suit was filed. For federal courts to retain jurisdiction, the parties in a dispute must continue to have a personal stake in the outcome of the lawsuit.

*Wallingford v. Bonta*, 82 F.4th 797, 800 (9th Cir. 2023) (cleaned up). Thus, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (cleaned up). Instead, "the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980). "Whereas standing is evaluated by the facts that existed when the complaint was filed, mootness inquiries … require courts to look to changing circumstances that arise after the complaint is filed." *Am. C.L. Union of Nevada v. Lomax*, 471 F.3d 1010, 1016 (9th Cir. 2006) (cleaned up). Here, circumstances changed. The court below erred in refusing to allow an amendment which would conform pleadings to those circumstances, and erred in ignoring its earlier ruling that, without a sales dispute,

the parties no longer disputed a constitutionally cognizable "Case" or "Controversy."

## II. MORGAN PREVAILS ON THE MERITS OF HIS CLAIM.

Twitter obtained the cell numbers of Washington residents by deceptively claiming that they would be used only to authenticate users' accounts. Instead, Twitter used those numbers to target advertising to those users—a practice for which Twitter was required to pay $150 million to settle a complaint by the FTC.[16] The question raised in this case—if the Court finds jurisdiction—is whether or not Twitter also violated RCW 9.26A.140(1)(b). In this case of first impression, the merits of Morgan's claim depend upon the proper interpretation of a Washington remedial statute, a type of statute which the Washington Supreme Court has repeatedly said should be broadly construed.

Twitter contends that it did not violate the statute, presenting a shifting and mutually contradictory set of rationales in the guise of statutory construction. It also contends that Morgan's FAC must satisfy the pleading standards of Rule 9(b), again with a variety of explanations as to why a state law that bans the use of "deceptive means" to obtain a telephone record, as an alternative basis for liability, along with the ban on the use of false means or fraudulent means, requires proof of actual fraud. Neither Twitter's various arguments, nor any rationale adopted by the court below,

---

[16] https://www.ftc.gov/business-guidance/blog/2022/05/twitter-pay-150-million-penalty-allegedly-breaking-its-privacy-promises-again

withstands scrutiny in light of the Washington Supreme Court's clear and long-established procedures for statutory construction.

### A. RCW 9.26A.140 Is A Remedial Consumer Protection Act.

Morgan's FAC alleges that Twitter, by deceptive means, obtained a telephone record that pertains to him. Morgan thereby alleged that Twitter violated RCW 9.26A.140(1)(b):

> (1) A person is guilty of the unauthorized sale or procurement of telephone records if the person … (b) By fraudulent, deceptive, or false means obtains the telephone record of any resident of this state to whom the record pertains;
>
> * * *
>
> (4) A person who violates this section is subject to legal action for injunctive relief and either actual damages, including mental pain and suffering, or liquidated damages of five thousand dollars per violation, whichever is greater. Reasonable attorneys' fees and other costs of litigation are also recoverable.

The FAC's allegation that Twitter procured Morgan's cell phone number states a valid claim, because the statute's extremely broad definition of "telephone record" specifically includes telephone numbers:

> (5)(b) "Telephone record" means information retained by a telecommunications company that relates to the telephone number dialed by the customer or the incoming number or call directed to a customer, or other data related to such calls typically contained on a customer telephone bill such as the time the call started and ended, the duration of the call, the time of day the call was made, and any charges applied. "Telephone record" does not include any information collected and retained by customers using caller identification or other similar technologies.

Finally, the FAC alleges "procurement" by Twitter, which, like "telephone record," the Legislature defined as broadly as imaginable:

(5)(c) "Procure" means to obtain by any means, whether electronically, in writing, or in oral form, with or without consideration.

Morgan's FAC alleges all the elements of Twitter's violation of RCW 9.26A.140(1)(b): Twitter used deceptive means to procure his telephone number, a protected telephone record. This conclusion must follow from faithful application of the rules of construction. Properly construing this text, read broadly in the entire context of the remedial nature of the statute and in light of the purpose for which it was enacted, a court must conclude that:

- The statute protects cell phone numbers as "telephone records;"
- The statute bars *any* person from wrongfully obtaining records from *any* source including the affected resident of Washington;
- The statute proscribes three *different* wrongful means of obtaining records: fraudulent, deceptive, and false means; and
- The deceptive means it proscribes are acts with the *capacity* to deceive; and
- The statute's text and structure preclude any mandate that a plaintiff allege the elements of fraud under either Wash. Super. Ct. Civ. R. 9(b) or its federal counterpart.

Individual elements of the statute are considered in isolation below, but considering the text of the statute as a whole—as required by the Supreme Court—leaves no ambiguity.

Unlike many statutes that grant standing to specific individuals to obtain a remedy for an identified wrong, RCW 9.26A.140 begins by identifying the prohibited

behavior, and then broadly and generally authorizes suit against the wrongdoer, to impose both civil and criminal remedies upon those who violate it.[17] Although the statute authorizes an award of "actual damages, including mental pain and suffering," the attorney general (or any individual like Morgan) may bring suit to recover liquidated damages of five thousand dollars per violation. Recognizing the enormous financial incentives to obtain telephone records through false or deceptive means, the legislature created an enforcement mechanism to operate as a deterrent to the prohibited behavior and to provide a remedy to residents should it nonetheless occur.

**B.    The Statute's Definition Of "Telephone Record" Explicitly Includes Phone Numbers.**

"Legislative definitions provided in a statute are controlling," *Fraternal Ord. of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Ord. of Eagles*, 148 Wash. 2d 224, 239 (2002), and here, the definition of "telephone record" in RCW 9.26A.140(5) explicitly includes telephone numbers:

"Telephone record" means information retained by a telecommunications company that relates to the telephone number dialed by the customer or the incoming number or call directed to a customer, or other data related to such calls typically contained on a customer telephone bill such as the time the call started and ended, the duration of the call, the time of day the call was made, and any charges applied. "Telephone record" does not include any

---

[17] Morgan's standing *in state court* to bring suit under the statute will be clear given the different standards for establishing subject matter jurisdiction in state court.

information collected and retained by customers using caller identification or other similar technologies.

Consistent with the rule of construction that the court must broadly construe this remedial statute, the definition provides the broadest possible list of information that the Legislature defined as protected "records." An alternative construction of "record" to mean "all information related to telephone numbers *except the number itself*" is neither broad, nor remedial, nor a plausible discernment of legislative intent in a remedial statute protecting any "resident of this state" from the unauthorized procurement and sale of those records.

In this, as in scores of other statutes, the Legislature used "relates to" as a broadening, not limiting phrase. Examples abound. A similarly structured definition can be found in RCW 26.55.010: "'Canadian domestic violence protection order' means a judgment or part of a judgment or order issued in a civil proceeding by a court of Canada under law of the issuing jurisdiction which relates to domestic violence." Obviously, the Legislature did not exempt a judgment of domestic violence, while only including judgments of related matters. The definition of "health information" in RCW 48.02.068 uses the same structure:

> "Health information" means any information or data, except age or gender, whether oral or recorded in any form or medium, created by or derived from a health care provider or a patient, or a policyholder or enrollee, that relates to:
>
> (i) The past, present, or future physical, mental, or behavioral health or condition of an individual;
>
> (ii) The provision of health care to an individual; or
>
> (iii) Payment for the provision of health care to an individual.

Information that "relates to" mental or behavioral health or condition must be read to include the person's actual behavioral health and condition, as well as other related information such as medications or treatments. This drafting phrase is not only found in definitions. For example:

> No development credit corporation shall be organized with a capital stock of less than twenty-five thousand dollars, which shall be paid into the treasury of the corporation in cash before the corporation shall be authorized to transact any business other than such as relates to its organization.

RCW 31.20.040. The business the corporation is allowed to transact is the business of organizing itself, and other such business, such as hiring the lawyers who draft its charter. It makes no sense to read "relates to" as allowing the nascent corporation to transact all business related to organizing itself but not actually organize itself.

These common-sense applications of the term "relates to" can also be found in widely disparate federal contexts, such as ERISA pre-emption and federal removal jurisdiction under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. *See, e.g.*, *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985) ("The phrase 'relate to' was given its broad common-sense meaning, such that a state law 'relates to' a benefit plan in the normal sense of the phrase, if it has a connection with or reference to such a plan.") (cleaned up); *Infuturia Glob. Ltd. v. Sequus Pharms., Inc.*, 631 F.3d 1133, 1138 (9th Cir. 2011) (construing 9 U.S.C. § 205, holding that "the phrase 'relates to' is plainly broad, and has been interpreted to convey sweeping removal jurisdiction in analogous statutes.") (cleaned up).

Finally, the Caller ID exception in the second sentence only makes sense if numbers are included in the definition of "telephone record," except when gathered using Caller ID. "It is a well established principle of statutory construction that provisos and exceptions remove something from the enacting clause that would otherwise be contained therein." *Tyler Pipe Indus., Inc. v. State, Dep't of Revenue*, 96 Wash. 2d 785, 788 (1982). The "information collected … using caller identification" is, first and foremost, telephone numbers. If those numbers are not already protected by the first sentence of the definition, there is no purpose to the exception. A contrary construction contradicts the rule that "constructions that would render a portion of a statute meaningless or superfluous should be avoided," *Ford Motor Co. v. City of Seattle, Exec. Servs. Dep't*, 160 Wash. 2d 32, 41 (2007), and that "each word of a statute is to be accorded meaning." *State v. Roggenkamp*, 153 Wash. 2d 614, 624 (2005). If numbers do not fall within the definition in the first sentence, what meaning can plausibly be attached to the second?

## C. The Statute Proscribes Not Only False Or Fraudulent Conduct But Also "Deceptive Means."

Twitter urged, and the court below agreed, that a plaintiff seeking the remedy for a violation of RCW 9.26A.140(1)(b) must satisfy the fraud pleading standard of Rule 9(b), corresponding to the CR 9(b) standard in Washington's Civil Rules. This construction is contradicted by the text of the clause itself, is impossible to square with the statute as a whole, and is belied by decades of Washington case law.

RCW 9.26A.140(1)(b) proscribes three different types of conduct, in a disjunctive list. "As a default rule, the word 'or' does not mean 'and' unless

legislative intent clearly indicates to the contrary." *Guijosa v. Wal-Mart Stores, Inc.*, 101 Wash. App. 777, 790 (2000). Instead, "we presume 'or' is used in a statute disjunctively unless there is clear legislative intent to the contrary." *Ctr. for Env't L. & Pol'y v. Dep't of Ecology*, 196 Wash. 2d 17, 33 (2020). Thus, the proper construction of the prohibition on procurement using "fraudulent, deceptive, or false means" must be read as targeting fraudulent means, deceptive means, and false means, with different meanings attributed to each type of conduct. Unlike deception, fraud in Washington requires falsity and the plaintiff's justified reliance on believing the truth of a false statement:

> The elements of fraud include:
> (1) representation of an existing fact; (2) materiality; (3) falsity; (4) the speaker's knowledge of its falsity; (5) intent of the speaker that it should be acted upon by the plaintiff; (6) plaintiff's ignorance of its falsity; (7) plaintiff's reliance on the truth of the representation; (8) plaintiff's right to rely upon it; and (9) damages suffered by the plaintiff.

*Adams v. King Cnty.*, 164 Wash. 2d 640, 662 (2008). By contrast, deception "appears to be a broader term designed to encompass not only representations about past or existing facts, but also representations about future facts, inducement achieved by ***means other than conduct or words***, and inducement achieved by creating a false impression even though particular statements or acts ***might not be false***." *State v. Casey*, 81 Wash. App. 524, 528 (1996) (emphasis added). If a Washington plaintiff seeking relief from deception were required to satisfy a pleading requirement of showing a false representation of a material fact, the effect would be to read the word "deceptive" out of the statute and replace it with "fraud."

This is also consistent with decades-old jurisprudence construing the Consumer Protection Act, which similarly proscribes "deceptive acts." That statute, which similarly creates consumer protections and a private right of action, states that "[u]nfair methods of competition and unfair or ***deceptive acts*** or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW 19.86.020 (emphasis added). A court evaluating an alleged deceptive act under the Washington CPA focuses on the *capacity* of that act to mislead a substantial portion of the public, but does not require that a CPA plaintiff actually allege or prove either that the actor intended to deceive, or that she herself was deceived. "An unfair or deceptive act or practice need not be intended to deceive—it need only have the capacity to deceive a substantial portion of the public. . . The purpose of the capacity-to-deceive test is to deter deceptive conduct before injury occurs." *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 162 Wash. 2d 59, 73–75 (2007). Legislators are presumed to legislate in light of existing law. *Campbell & Gwinn*, 146 Wash. 2d at 11. In using the similar phrase "deceptive means," the Legislature is presumed to incorporate that long-established meaning into the new statute, a meaning that is impossible to align with the third through eighth elements of fraud in Washington law: that a defendant knowingly make a false statement for the purpose of inducing action, together with the plaintiff's ignorance of falsity and justifiable reliance on believing it is true.

The entirety of the statute also demonstrates that pleading a violation of RCW 9.26A.140(1)(b) cannot require the Rule 9(b) elements. First, "procure" is defined so broadly as to preclude mandatory application of fraud pleading: it means "to

obtain by any means, whether electronically, in writing, or in oral form, with or without consideration." Certainly written or oral conduct might include a speaker's knowingly false statements, intended to induce reliance by a plaintiff who believes them true. But "any means" is broader, and would include "inducement achieved by means other than conduct or words," which falls within the much broader definition of "deception" in *Casey*, 81 Wash. App. 524.

Finally, the method by which the Legislature created the cause of action precludes any requirement that the plaintiff show damages, the ninth fraud element. First, the statute subjects the bad actor to suit, rather than vesting a right to sue in an aggrieved person. Phrased in the manner of a *qui tam* or private attorney general statute, the cause of action in RCW 9.26A.140 (4), subjecting a bad actor to suit, cannot be squared with mandatory fraud pleading. Further, the cause of action specifically allows recovery even without showing "actual damages," instead allowing the recovery of statutory damages. Unlike a fraud claim that ***requires*** proof of damages suffered by the plaintiff, this statute is broader.

### D. The Legislative History Dispels Any Doubt That Cell Phone Numbers Are Protected.

Any construction that exempts Morgan's cell phone number from the scope of protection is flatly contradicted by the Final Bill Report, all preceding bill reports, and the course of amendment that expanded the protections of the original bill. As noted above, the Washington Supreme Court appears never to have adopted a statutory construction contradicted by the Final Bill Report, which is circulated to legislators together with the text of every enactment. The Final Bill Report

specifically states that "Various terms are defined, such as 'telephone record,' which *includes telephone numbers* and calling records, but does not include caller ID or similar services."[18] (emphasis added). It also emphasizes that the bill was drafted to augment existing protections for "a customer's proprietary network information (CPNI), such as the customer's *unlisted telephone number*, what numbers are called, the length and price of such calls, and information about any subscribed services."[19] (emphasis added). By 2006, when the Legislature considered and passed this law, Washington law already required that all wireless telephone numbers remain unlisted except with an affirmative opt-in by the subscriber. *See* RCW 19.250.010, Ch. 322, Laws of 2005 (requiring affirmative consent for directory publication of cell phone numbers). Thus, wireless numbers already constituted CPNI by default, and were thereby doubly identified in the bill reports as express target of the protections of the bill. The very first iteration of the bill prohibited "the unauthorized sale of cell phone numbers."[20] The accompanying bill report reiterated in the brief description that the bill "[p]rohibit[ed] the unauthorized sale of cell phone numbers," while the

---

[18] https://lawfilesext.leg.wa.gov/biennium/2005-06/Pdf/Bill%20Reports/Senate/6776-S.FBR.pdf?q=20240414132604. This and all legislative history is available at: https://app.leg.wa.gov/billsummary?BillNumber=6776&Year=2005&Initiative=false. Notably, even today that web page, the Legislature's bill summary page for the 2006 enactment, captions the bill as "Prohibiting the unauthorized sale of cell phone numbers."

[19] *Id.*

[20] 2006 SB 6776, available at: https://lawfilesext.leg.wa.gov/biennium/2005-06/Pdf/Bills/Senate%20Bills/6776.pdf?q=20240414132604.

accompanying background section made clear that those cell phone numbers were CPNI and one aspect of "a person's telephone records" protected by the bill.[21]

The bill went through a series of broadening amendments. In the first version, the bill stated that "No person shall buy or sell the telephone number or call record of any subscriber of a radio communications service company …" *i.e.*, cell phone company.[22] The initial bill did not create a right of action, and the accompanying bill report identified that it created additional state law protections for CPNI, which included unlisted numbers.[23] The bill was then amended to final form, broadening every aspect of the protections. It expanded from "buy" and "sell" to include sell, obtain, purchase, and knowingly receive; it created a private remedy against wrongdoers, included statutory damages and attorneys' fees; and it expanded the protected information from merely telephone numbers and call records to "telephone records."[24] Demonstrating that this amendment broadened protections, the accompanying bill report continued to state that the Legislature was concerned to add state protections to CPNI, and stated directly that the definition of

---

[21] https://lawfilesext.leg.wa.gov/biennium/2005-06/Pdf/Bill%20Reports/Senate/6776.SBR.pdf?q=20240414132604.

[22] 2006 SB 6776, available at: https://lawfilesext.leg.wa.gov/biennium/2005-06/Pdf/Bills/Senate%20Bills/6776.pdf?q=20240414132604.

[23] https://lawfilesext.leg.wa.gov/biennium/2005-06/Pdf/Bill%20Reports/Senate/6776.SBR.pdf?q=20240414132604.

[24] https://lawfilesext.leg.wa.gov/biennium/2005-06/Pdf/Bills/Senate%20Bills/6776-S.E.pdf?q=20240414132604.

"telephone records" "includes telephone numbers and calling records …"[25] The Final Bill Report contains identical language.[26]

In short, every item of legislative history confirms that from the moment of introduction through to final adoption, this statute protected cell phone numbers from wrongful procurement. There is no precedent in Washington Supreme Court jurisprudence to construe the statute contrary to this overwhelming weight of legislative history.

## Conclusion.

Twitter is not entitled to its chosen forum. It removed late; it failed to satisfy its burden to demonstrate Article III standing; it failed to establish sufficient prejudice to deny Morgan's amendment; and once Morgan abandoned the dispute upon which removal was originally justified, there was no longer a federally cognizable case or controversy. "Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992).

The trial court also failed to give the operative statute the broad reading that a remedial statute is accorded under Washington precedent. Because a cell number is a "telephone record," the procurement of cell numbers by deceptive means—which Twitter has effectively admitted—is subject to the remedy authorized by the

---

[25] https://lawfilesext.leg.wa.gov/biennium/2005-06/Pdf/Bill%20Reports/Senate/6776-S.SBR.pdf?q=20240414132604.

[26] https://lawfilesext.leg.wa.gov/biennium/2005-06/Pdf/Bill%20Reports/Senate/6776-S.FBR.pdf?q=20240414132604.

statute. By failing to consider the statute as a whole, giving its remedial provisions a broad reading, the trial court robbed the statute of its ability to deter the prohibited conduct.

    This Court should vacate the judgment below and order the case to be remanded to Spokane County.

April 19, 2024.

ARD LAW GROUP PLLC

By: _____

Joel B. Ard, WSBA # 40104
Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
206.701.9243
Joel@Ard.law
Attorneys For Plaintiff-Appellant

ALBRECHT LAW PLLC

By: _____

David K. DeWolf, WSBA #10875
5105 E 3rd Ave., Suite 101
Spokane Valley, WA 99212
(509) 495-1246
Attorneys For Plaintiff-Appellant

## Certificates

This filing complies with the length requirements of Federal Rule of Appellate Procedure 35 because it contains fewer than **14,000** words.

This filing complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32 because it uses a proportionally spaced typeface, Equity 14 point.

This filing was served on all parties' counsel at the time of filing by delivering it through the Court's electronic docketing system.

Ard Law Group PLLC

By: _____

Joel B. Ard, WSBA # 40104
Ard Law Group PLLC
P.O. Box 11633
Bainbridge Island, WA 98110
206.701.9243
Joel@Ard.law
Attorneys For Plaintiff-Appellant